UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHAEL THOMAS WHITE,

    Plaintiff,

v.                                    Case No: 8:15-cv-2050-T-27JSS

THOMAS M. KNIGHT, MATTHEW
TUGGLE, LINCOLN DILLING,
CLAUDE SUNDERMAN, DEREK
BAKER, ADAM SHAW and JAMES
LYNCH,

    Defendants.
_____/

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Dkt. 50) filed on May 9, 2017. Despite two extensions (Dkts. 57, 62), White has not responded to the motion. Upon consideration, the motion (Dkt. 50) is GRANTED.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving

---

[1] Plaintiff was advised of the requirements of Rule 56, Fed.R.Civ.P. (Dkt. 13, p. 4, ¶ 11).

party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L.Ed.2d 142 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir.2004).

Once a party properly filing a summary judgment motion demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 323–24. Pursuant to Rule 56, the party opposing a motion for summary judgment must respond with counter sworn affidavits and/or documents to set forth specific facts showing that there is a genuine issue of material fact in dispute. If the opposing party fails to respond to the motion, the Court may declare that the facts in the affidavits and/or documents supporting the motion are established as true and that there is no genuine issue of material fact in dispute. *Simpson v. Holder*, 184 F. App'x 904, 907 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(e)(2)). The evidence will not be weighed and the Court will not make findings of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence on which a reasonable jury could find for the non-moving party. *Id.*

As noted, White did not respond to Defendants' motion. Accordingly, the facts in affidavits filed in support of Defendants' motion are established as true, and there is no genuine issue of material fact.

## UNDISPUTED FACTS

On August 9, 2014, the Defendant Deputies were actively searching for a robbery suspect who had committed several robberies along U.S. Highway 41 in Sarasota. The suspect was described as a white male wearing a partial mask. At approximately 4:00 p.m., Defendant Lynch saw a vehicle matching the description of the suspect's vehicle behind several businesses along U.S. 41. (Doc. #50-6, Lynch Aff. at ¶2). Lynch observed the driver of the vehicle as a white male with a slender build, wearing a multi-colored hat. *Id.* This description matched the suspect information issued by the Sheriff's Office and the City of Sarasota Police Department. *Id.*

Lynch observed the suspect vehicle drive behind a Chili's next to a strip mall. *Id.* at ¶3. The vehicle slowed down in front of a smaller business and to Lynch, the suspect appeared to be "casing" the location. *Id.* The vehicle exited and traveled northbound on U.S. 41. *Id.* Lynch retrieved the vehicle's license plate number, ran a search and discovered the vehicle had been stolen in Collier County. (Baker Aff. at ¶3; Lynch Aff. at ¶3; Tuggle Aff. at ¶3). Lynch observed the vehicle turn west into another parking lot. (Lynch Aff. at ¶3).

At this point, Lynch advised multiple surveillance units in the area of the suspect vehicle's description and last known location. (Baker Aff. at ¶2; Doc. #2, Dilling Aff. at ¶2; Lynch Aff. at ¶3; Shaw Aff. at ¶2; Sunderman Aff. at ¶2). He lost sight of the vehicle as it traveled north behind a business plaza. (Dilling Aff at ¶4; Lynch Aff. at ¶4). Dilling checked along U.S. 41 north of the suspect vehicle's last reported location. (Dilling Aff. at ¶4). He saw a vehicle matching the suspect vehicle's description traveling north on U.S. 41 in a turn lane for a plaza at the northeast corner of U.S. 41 and Bahia Vista Street. *Id.* Dilling observed that the license tag number matched the suspect

3

vehicle's number as identified by Lynch. *Id.* Dilling advised over his radio that he had located the suspect vehicle, causing several units to respond to Dilling's location. (Baker Aff. at ¶4; Dilling Aff. at ¶4; Lynch Aff. at ¶5; Shaw Aff. at ¶3; Sunderman Aff. at ¶2; Tuggle Aff. at ¶4). The suspect vehicle then turned into the plaza, circled around the back of the plaza and cut south across Bahia Vista Street into the plaza on the southeast corner of U.S. 41 and Bahia Vista Street. (Dilling Aff. at ¶5).

The vehicle moved westward through the plaza toward U.S. 41, entered U.S. 41, and traveled northward. *Id.* Additional units arrived as the vehicle continued north, making quick lane changes. (Baker Aff. at ¶4; Dilling Aff. at ¶5). Once the suspect vehicle was located in the vicinity of U.S. 41 and Bahia Vista Street, a Sheriff's helicopter observed the vehicle from the air. (Vleck Aff. at ¶3). After the vehicle entered U.S. 41, Tuggle's vehicle was one lane over and one car length behind the suspect vehicle. (Tuggle Aff. at ¶4). Tuggle saw that the suspect vehicle's driver matched the description given earlier by Lynch. *Id.* The vehicle approached a fork in the road where the center lane of U.S. 41 divides; left toward Mound Street and right toward Washington Boulevard. *Id.* at ¶5. Tuggle maneuvered directly behind it and prepared to make a stop when the vehicle "recklessly cut back across the roadway and headed north on Washington Boulevard." *Id.* at ¶6. Baker's vehicle was directly behind Tuggle and Sunderman's vehicle was in front of the suspect vehicle. (Baker Aff. at ¶4; Sunderman Aff. at ¶3).

Tuggle activated his lights and siren and followed the vehicle, which had slowed to turn east on Alderman Street. (Tuggle Aff. at ¶6). It nearly stopped but quickly accelerated away from Tuggle's vehicle. *Id.* Tuggle pursued the vehicle and Baker, Defendant Lynch and Sunderman joined the pursuit. (Baker Aff. at ¶5; Sunderman Aff. at ¶3; Tuggle Aff. at ¶7). The vehicle drove north,

traveled through a parking lot, and turned back to exit on Alderman Street. (Baker Aff. at ¶5; Dilling Aff. at ¶6; Sunderman Aff. at ¶3; Tuggle Aff. at ¶7-8).

Tuggle used his vehicle to conduct a low speed Precision Immobilization Technique ("PIT") maneuver to temporarily stop the vehicle. (Baker Aff. at ¶6; Dilling Aff. at ¶6; Lynch Aff. at ¶5; Shaw Aff. at ¶7; Sunderman Aff. at ¶3; Tuggle Aff. at ¶8; Vleck Aff. at ¶3; Dkt. 1 at ¶5). Tuggle's PIT maneuver caused his vehicle to come to rest against the passenger side of the vehicle. (Vleck Aff. at ¶3). Tuggle saw the driver, Plaintiff Michael White, lean over toward the passenger side of the vehicle, causing Tuggle to "immediately" exit his vehicle "because I knew the robbery suspect to be armed with a handgun." (Tuggle Aff. at ¶8). At the same time, Baker saw White "pick up a firearm from the front passenger's seat." (Baker Aff. at ¶6). Lynch's vehicle contacted the driver's side of White's vehicle at low speed to block it from further movement, causing White to "lose his grip of the firearm." (Baker Aff. at ¶6; Dilling Aff. at ¶6; Lynch Aff. at ¶5-6; Shaw Aff. at ¶7; Tuggle Aff. at ¶9).

Lynch's blocking of the vehicle caused White to be "pinned in the vehicle" and unable to "flee in the suspect vehicle or on foot." (Lynch Aff. at ¶5; Vleck Aff. at ¶3). Because the driver's door of the vehicle was blocked, White could only exit through the driver's side window. (Baker Aff. at ¶8; Lynch Aff. at ¶5). Because White still had access to a firearm, he needed to be quickly removed from the suspect vehicle. (Baker Aff. at ¶9; Dilling Aff. at ¶8; Lynch Aff. at ¶5; Shaw Aff. at ¶8; Sunderman Aff. at ¶4; Tuggle Aff. at ¶9).

Tuggle, with his weapon drawn and pointed at White, saw White continue to "reach around inside the stolen vehicle" despite Tuggle ordering him to "put his hands up." (Tuggle Aff. at ¶9).

5

Dilling, with his weapon drawn and pointed at White, also ordered White to put his hands up. White "finally complied and showed his hands." (Dilling Aff. at ¶7). Shaw approached White from the hood of Lynch's vehicle, determined it was important to get White out of the vehicle "as soon as possible" and "decided to go hands on" to remove him. Shaw Aff. at ¶9). Shaw grabbed White's left hand and ordered him to give him his other hand. (Shaw Aff. at ¶9-10; Dkt. 1 at ¶5). White "initially did not comply" with Shaw's command, but eventually produced his right hand. *Id.* Dilling assisted Shaw in pulling White from the vehicle through the driver's side window. (Dilling Aff. at ¶8; Shaw Aff. at ¶10; Sunderman Aff. at ¶4; Tuggle Aff. at ¶9). Because the driver's side window was halfway up, pulling White out through the window caused it to shatter, resulting in White sustaining "lacerations." (Baker Aff. at ¶8).

Dilling and Shaw then placed White on the hood of Lynch's vehicle and lowered him to the ground. (Dilling Aff. at ¶8; Shaw Aff. at ¶10; Sunderman Aff. at ¶4; Vleck Aff. at ¶4). The deputies attempted to handcuff White, who did not initially comply with orders to "stop resisting." (Lynch Aff. at ¶9; Shaw Aff. at ¶11). The deputies were concerned White might have a firearm as they removed him from the vehicle. (Baker Aff. at ¶9; Lynch Aff. at ¶8-9; Tuggle Aff. at ¶9). Lynch "issued multiple knee strikes to [White's] left side" to "distract the suspect, gain compliance and break any grip he might have on the firearm." (Lynch Aff. at ¶9). The deputies were then able to get White's hands behind his back and handcuffed. (Baker Aff. at ¶10; Shaw Aff. at ¶11; Vleck Aff. at ¶4).

Once the deputies handcuffed and secured White, they called for EMS to take him to Sarasota Memorial Hospital. (Baker Aff. at ¶11; Shaw Aff. at ¶12; Dkt. 1 at ¶6). After he was removed from the scene, the deputies moved the suspect vehicle and discovered a "replica" firearm "that looked exactly like a real gun." (Baker Aff. at ¶11; Dilling Aff. at ¶8; Lynch Aff. at ¶6). At the hospital,

Shaw reported to a nurse that White was involved in a collision that was not an "accident," but an "intentional maneuver" done at low speed intended to "take the suspect into custody." (Shaw Aff. at ¶12; Dkt. 1 at ¶6).

## DISCUSSION

White alleges that he was exposed to double jeopardy by the police and then the courts. White also alleges that his Eighth Amendment right was violated by the use of excessive force during his arrest. Defendants contend that he was not subjected to double jeopardy or excessive force. Defendants contend they are entitled to qualified immunity.

### *(1)Fifth Amendment Double Jeopardy*

The Fifth Amendment to the U.S. Constitution guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb ...." U.S. Const. amend. V. Based on its plain text, the Amendment requires that criminal defendants demonstrate two things in order to invoke its protection: (1) that they have been "twice put in jeopardy"; and (2) that they have been so put for the "same offense." *Delgado v. Florida Dep't of Corr.*, 659 F.3d 1311, 1323 (11th Cir. 2011). "Jeopardy is said to attach when a defendant is put to trial." *Id.* at 1324.

White claims that he was subject to double jeopardy, first when he was arrested by the police, and again when he was tried in the state court. This contention is without merit. Here, White was arrested, charged and put to trial once, and found guilty by a jury. He was not subjected to double jeopardy as he was tried and convicted only once. Consequently, summary judgment is granted on his double jeopardy claim.

### (2) *Qualified Immunity*

Qualified immunity is a question of law, even when asserted on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed.2d 411 (1985).

> The objective nature of qualified immunity defines what fact issues are material for summary judgment purposes. To avoid summary judgment it is not enough for a plaintiff to produce evidence, which—if believed (for summary judgment its truth is assumed)—would allow a fact-finder to find just that the government-agent defendant was, in reality, wrong about the facts on which the defendant acted. Instead, to defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a fact-finder to find that no reasonable person in defendant's position could have thought the facts were such that they justified defendant's acts.

*Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993) (citing *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1234–35 (11th Cir. 1992)).

White contends that his Eighth Amendment right as a detainee was violated because Defendants used excessive force during his arrest. Defendants argue that summary judgment is appropriate on White's excessive force claim because they are entitled to qualified immunity. They are correct, based on the undisputed facts.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982). As such, qualified immunity allows officials to "carry out their discretionary duties without fear of personal liability or harassing litigation[.]" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.2002) (internal citations omitted). "[O]nly in exceptional circumstances will government actors have no shield against claims made against them in their individual capacities." *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th

Cir.1994) (*en banc*) (citations and emphasis omitted). Because qualified immunity is "immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), its purposes would be "thwarted if a case is erroneously permitted to go to trial." *Baltimore v. City of Albany, Georgia,* 183 Fed. App'x 891, 895 (11th Cir.2006) (citations and quotations omitted).

To qualify for qualified immunity, the public official must first establish that they were acting within the scope of their discretionary authority. *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002). Once that showing is made, the burden shifts to the plaintiff to show that qualified immunity should not apply. *Lewis v. City of W. Palm Beach, Fla.,* 561 F.3d 1288, 1291 (11th Cir.2009). First, a plaintiff must show that, considered in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001). If no constitutional right was violated, the defendant is entitled to qualified immunity. If the facts establish a constitutional violation, a plaintiff must then show that, at the time the incident occurred, "every reasonable police officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens–Clarke Co.,* 378 F.3d 1274, 1278–79 (11th Cir.2004) (citing *Saucier,* 544 U.S. at 201–02).

### (a) *Whether the Defendants were Acting Within the Scope of Their Discretionary Authority*

There is no dispute that Defendants were acting within the scope of their discretionary authority in investigating White as a suspect in several armed robberies when he was arrested. *See, e.g., Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir.2004). He was in the area where the

armed robberies had occurred and matched the description of the suspect who committed the armed robberies. He was driving a vehicle that fit the description of the one used by the suspect.

### (b) *Whether Defendants Violated White's Constitutional Rights*

While White argues that his Eighth Amendment rights were violated, excessive force claims arising from an arrest fall under the Fourth Amendment. The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force during an arrest. *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (*citing Graham v. Connor*, 490 U.S. 386, 394–95, 109 S. Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)).

Excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness" standard rather than under a substantive due process standard. *Id.* The "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and the analysis must allow for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. *Id.* at 387. To determine whether the amount of force used was reasonable, it must be asked whether a reasonable officer would believe that the level of force was necessary. *Id.* at 396-97. The Supreme Court has held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S. Ct. at 1871 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S. Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (internal quotations omitted)). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27, 88 S. Ct. 1868, 1880–83, 20 L.Ed.2d 889 (1968)).

It has been established that in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a number of factors must be evaluated, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id. See also, e.g., Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir.1986) (holding that, in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted). *Graham* instructs that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight. *Ferraro*, 284 F.3d at 1197–98.

Based on the video and the undisputed facts, Defendants did not use excessive force in arresting White. The crimes he was suspected of, armed robbery, were serious and created a grave danger to the officers and general public. White evaded the deputies once he realized his vehicle was under surveillance. (Doc. #50-7). According to the surveillance video, he began to change lanes, speed up and take evasive actions. (Doc. #50-7). To prevent him from evading pursuit, Tuggle used his vehicle to conduct a low speed Precision Immobilization Technique (PIT) to stop him. Tuggle pushed his vehicle against the rear fender of White's vehicle as he made a turn seeking to exit the parking lot. The PIT maneuver caused White's vehicle to spin around and stop. At that point, Lynch

11

drove his vehicle into the side of White's driver's side door to prevent White from exiting the vehicle. From Defendants' video evidence (Doc. #50-7), neither maneuver caused noticeable physical damage to the vehicles.

The evidence, viewed in the light most favorable to White, shows that Tuggle acted objectively reasonably when he used his police vehicle to disable White's vehicle. Tuggle knew that White was a suspect in several armed robberies that had occurred in the area where he was found. Once he spotted Defendants behind him, White began evasive maneuvers. When Tuggle begin to pursue him, he drove at a high speed through traffic on a busy road with numerous civilian vehicles. Considering the totality of the circumstances, an objective officer in Tuggle's situation could have reasonably believed that White posed a threat of serious physical injury to pedestrians, other civilian motorists, and to the officers themselves.

This Circuit has held that in situations where officers have used their vehicles to stop a fleeing armed robbery suspect's vehicle, the use of such force is reasonable. *Murphy v. Demings*, 626 F. App'x 836, 839–40 (11th Cir. 2015). Tuggle's decision to eliminate the threat of danger to bystanders and officers by disabling White's car with a PIT maneuver was objectively reasonable under the Fourth Amendment. *See Scott v. Harris*, 550 U.S. 372, 383 127 S. Ct. 1778, 167 L. Ed. 686 (2007) (an officer acted objectively reasonably in striking a suspect's car after the suspect engaged in a high-speed chase with multiple police cars, evaded police attempts to block his car, hit a police car, and drove recklessly); *Sharp v. Fisher*, 532 F.3d 1180, 1184 (11th Cir. 2008) (no Fourth Amendment violation occurred when an officer struck a suspect's car while the suspect was engaged in a high-speed chase, was being pursued by multiple officers, was driving erratically, and was in an area with several other civilian motorists).

White has failed to demonstrate either the existence of a constitutional violation or that Tuggle violated a clearly established constitutional right of which a reasonable person would have known, given the circumstances.

Once White's vehicle was stopped, Defendants moved into position and removed him from the vehicle. Since one of the Defendants' vehicles was against White's driver's side door, preventing him exiting the vehicle, Defendants pulled him from the vehicle through the driver's side window, which was rolled half way down. His back was scraped when he was pulled from the vehicle. White argues that dragging him through window constituted excessive force because he was obeying the Deputy's commands.

Defendants do not dispute that White was pulled through the window. However, they point out that he was a suspect in several armed robberies and they believed he was armed when they were able to stop his vehicle. (Lynch Aff. at ¶5; Vleck Aff. at ¶3). When Shaw grabbed White's left hand and ordered White to give him his other hand, he "initially did not comply" with that command and Shaw begin to pull him through the window. (Shaw Aff. at 9-10; Dkt. 1 at 5). And Tuggle saw White continue to "reach around inside the stolen vehicle" despite ordering him to "put his hands up." (Tuggle Aff. at 9). Dilling also ordered White to put his hands up before he "finally complied and showed his hands." (Dilling Aff. at 7). Shaw had determined that it was important to get White out of the vehicle "as soon as possible" and "decided to go hands on" to remove him. (Shaw Aff. at 9). As noted, White "initially did not comply" with Shaw's command. As Shaw begin to pull White through the window, he produced his right hand. *Id.*

Defendants were concerned White might have a firearm as they removed him from the vehicle. White was drawn across the hood of Lynch's vehicle and placed on the ground. Once on the ground, Shaw, Dilling, and Lynch rolled him over and secured him with handcuffs. Lynch acknowledges that he kneed White in the side several times because of his concern that White had a firearm in his hand. He wanted to distract him while the other deputies placed him in handcuffs. (Baker Aff. at 9; Lynch Aff. at 8-9; Tuggle Aff. at 9). Specifically, Lynch affirmed that he "issued multiple knee strikes to [White's] left side" to "distract the suspect, gain compliance, and break any grip he might have on the firearm." (Lynch Aff. at ¶9). Lynch stopped after White was secured.

The video appears to show that White was struggling to stay inside the car as the deputies tried to remove him. Since he was not complying with the commands to put his hands up, and the deputies believed he had a firearm in the vehicle, it was objectively reasonable for them to forcibly remove him from the vehicle in the manner they did, and as quickly as possible. The entire removal process from the time Shaw grabbed White's left arm and begin the extraction until he was cuffed on the ground took no longer than forty seconds. The timer on the video showed 16:10.11 when Shaw initially grabbed White's arm, and showed 16:10.47 when White was cuffed and secured. (Doc. #50-7).

While White alleges he was struck in the head multiple times while five or six officers held him down, the video shows that no more than four Defendants were engaged in subduing him once he was removed from the vehicle. He also alleges that one of the Defendants place his full weight on his head and rubbed his face in the asphalt. However, the undisputed evidence presented by video refutes that allegation. When "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*,

550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Accordingly, I find that White's allegation that one of the deputies put his full weight on his head and rubbed his face in the asphalt is refuted by the video evidence, and that no genuine issue of material fact remains for purposes of summary judgment.

"Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotations and citations omitted). Viewing the facts even in the light most favorable to White, a reasonable jury could not find that the Defendants' action constituted excessive force in violation of the Fourth Amendment. Based upon the video evidence, and Defendants' undisputed affidavits, Defendants used objectively reasonable force that a reasonable officer would have used in the same or similar circumstances when extracting and subduing White. Accordingly, there was no violation of White's Fourth Amendment rights.

### (c) *Whether Defendants Violated Clearly Established Law*

Defendants correctly argue that the Deputies did not violate clearly established law when White was arrested. Since Defendants did not violate White's Constitutional rights, no further inquiries are necessary on qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Nevertheless, even if Defendants violated White's Constitutional rights, a review of the facts demonstrates that Defendants did not violate any clearly established law.

"A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate. This doctrine provides

15

government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, ─── U.S. ───, 135 S. Ct. 348, 350, 190 L. Ed. 2d (2014) (internal citations and punctuation omitted). The inquiry is undertaken "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004). There need not be a case directly "on point" before it may be concluded that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, ─── U.S. ───, 134 S. Ct. 3, 5, 187 L.Ed.2d 341 (2013) (citation omitted). *See also Mullenix v. Luna*, ─── U.S. ───, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015). The "clearly established" analysis must identify a Supreme Court case where an officer acting under similar circumstances was held to have violated the federal right. *White*, 137 S. Ct. at 551.

Established law in similar circumstances has allowed for greater use of force, including deadly force, when apprehending an armed robbery suspect who officers believe to be armed. *See Murphy v. Demings*, 626 Fed. Appx. 836, 840 (11th Cir. 2015) (holding that deputy did not use excessive force when he shot and killed a fleeing armed robbery suspect who reached toward his waist band). Accordingly, Defendants did not violate clearly established law by using their vehicles to stop White's, removing him from the car, and holding him down until he could be handcuffed. Based on the pleadings and the undisputed material facts, Defendants are therefore entitled to qualified immunity on White's excessive force claims.

### *(3) Sheriff Knight*

White's Complaint names Sheriff Thomas Knight as a Defendant, but does not alleges whether he is being sued in his individual or official capacity. Defendants contend that summary judgment should be granted as to Sheriff Knight because White fails to allege any connection

between the Sheriff individually and any causal connection to the alleged excessive force. Defendants' also contend that Sheriff Knight is not liable in his official capacity because there is no policy or custom in place that resulted in the claimed constitutional violation.

### (a)*Personal Liability*

A claim for excessive force against Sheriff Knight in his individual capacity under § 1983 "must be based on something more than the theory of respondeat superior." *Braddy v. Fla. Dep't of Labor & Emp't Sec.*, 133 F.3d 7997, 801 (11th Cir. 1998). A supervisor may be liable only if he "personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). A "history of widespread abuse" may constitute a causal connection if that abuse is "obvious, flagrant, rampant, and of continued duration" so as to put the supervisor "on notice of the need to correct the deprivation, and he fails to do so." *C.P. by & through Perez v. Collier Cty.*, 2017 WL 1952402, at *5 (M.D. Fla. Feb. 3, 2017) (citing *Brown*, 906 F.2d at 671).

White makes no allegations that Sheriff Knight was present and participated in the alleged use of excessive force. The video does not show Sheriff Knight present during the PIT maneuver or during the removal of White from his vehicle. White's excessive force claim therefore fails as to Sheriff Knight in his individual capacity.

### (b)*Official Capacity*

To the extent White intends to sue Sheriff Knight in his official capacity under 42 U.S.C. § 1983, he presented no legally sufficient evidence to show that Sheriff Knight maintained a custom,

policy, or practice, which caused a violation of his constitutional rights. He did not allege or identify in his Complaint any custom, policy, or practice by Sheriff Knight that would result in a constitutional violation, as required. Since there are no genuine issues of material fact as to a custom, policy, or practice established by Sheriff Knight, summary judgment is due to be granted in Sheriff Knight's favor in his official capacity.

### (1)State Law Claims

Defendants argue that they are entitled to summary judgment on White's Florida Tort Claims Act for Battery because the deputies used objectively reasonable force in subduing White. Defendants also argue that summary judgment should be granted in their favor under Fla. Stat. § 776.032 and Fla. Stat. § 776.05.

### (a)Tort Claims Battery

"[A] battery consists of the intentional infliction of a harmful or offensive contact upon the person of another." *Greer v. Ivey*, No. 615CV677ORL41GJK, 2017 WL 1424345, at *20 (M.D. Fla. Mar. 14, 2017) (*quoting Sullivan v. Atl Fed. Sav. & Loan Ass'n*, 454 So. 2d 52, 54 (Fla. 4th DCA 1984)). "[A] presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." *Greer*, 2017 WL 1424345 at *20 (*quoting City of Miami v. Sanders*, 672 So.2d 46, 47 (3rd DCA 1996)). "[I]f such excessive force is used in an arrest, it is transformed into a battery." *Hung Phan v. City of St. Petersburg, Fla.*, 2007 WL 1225380, at *5. "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Berry v. McGowan*, No. 6:15-cv-145-ORL-41GJK, 2016 WL 4212068, at *6 (M.D. Fla. Aug. 10, 2016) (quotation omitted). "This is a 'similar standard' to that employed under the Fourth Amendment." *Id.* (*quoting Sullivan v. City of Pembroke Pines*, 161 Fed. Appx. 906, 911 (11th Cir. 2006)).

This Court has determined that the use of force in arresting White was objectively reasonable under the Fourth Amendment. Defendants are therefore entitled to summary judgment on his battery claim.

### (b)*Florida Constitutional Claims*

To the extent White raises any other state law claims, including Florida constitutional claims. against Defendants and the State of Florida, the Court declines to exercise supplemental jurisdiction over those claims. *Gross v. White*, No. 8:05CV176727TBM, 2007 WL 2875447, at *5 (M.D. Fla. Sept. 28, 2007), *aff'd,* 340 F. App'x 527 (11th Cir. 2009) (*citing* 28 U.S.C. § 1367(c)(3) District courts may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction)).

## CONCLUSION

There are no genuine issues of material fact precluding summary judgment in favor of Defendants. Accordingly, Defendants' Motion for Summary Judgment (Doc. 50) is **GRANTED**. The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions and deadlines, and close the file.

**DONE** and **ORDERED** this 25th day of September, 2017.

*[signature]*

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies: Michael Thomas White, Counsel of Record